IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBINETTE DAVIS ROSS, *Executrix of the Estate of William Bradford Ross, III*,     \*

       \*

    Plaintiff,

       \*     Civil No. TJS-17-0115

v.

       \*

LINDA CRAKES LINDLEY, *et al.*,

       \*

    Defendants.

       \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff William Bradford Ross, III ("Ross")[1] (ECF No. 41) and Defendants Linda Crakes Lindley ("Lindley") and RE/MAX 100 (collectively, "Defendants") (ECF No. 40). Having considered the submissions of the parties (ECF Nos. 40, 41, 42, 43, 44 & 45), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the reasons set forth below, Ross's motion (ECF No. 41) will be denied and Defendants' motion (ECF No. 40) will be granted.

**I.    Background**

Ross filed his Complaint (ECF No. 1) against Defendants on January 13, 2017. On February 23, 2017, Defendants filed a counterclaim against Ross. (ECF No. 9.) On March 17, 2017, this case was referred to me for all proceedings, pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF No. 15.) Ross filed an Amended Complaint (ECF No. 34) on May 30, 2017, and Defendants filed an amended answer and counterclaim thereafter (ECF No. 35).

---

[1] On February 9, 2018, the Court granted Ross's Motion to Substitute Party pursuant to Fed. R. Civ. P. 25. (ECF No. 47.) Because of Ross's death, Robinette Davis Ross (the executrix of his estate) has been substituted for Ross as the proper party. The Court also notes that there is some dispute regarding Ross's legal name (*see* ECF No. 40 at 5 n.1), but that dispute is immaterial to the resolution of the pending motions.

The Amended Complaint contains three counts: breach of contract (Count I), constructive fraud (Count II), and negligence (Count III). Defendants' counterclaim is for breach of contract (Count I) and contractual attorneys' fees/indemnification (Count II).

Because the Court's jurisdiction over this case is based on diversity, the Court must apply the choice of law rules of Maryland. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Maryland adheres to the *lex loci delicti* rule to determine the applicable law in tort actions. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744 (2000). Under this rule, the "substantive tort law of the state where the wrong occurs governs." *Hauch v. Connor*, 295 Md. 120, 123 (1983). For contract actions, Maryland follows the principle of *lex loci contractus*, applying the law of the jurisdiction where the alleged contract was made. The parties agree that Maryland substantive law applies to all of the claims at issue.

## II. Undisputed Facts

Unless otherwise specified, the following facts are not in dispute. Additional facts, some of which are in dispute, will be discussed later in this opinion. This case arises from Ross's agreement to lease his property to non-party Kendall Williford ("Williford"). The property, located at 11932 Maiden Point Farm Road, Newburg, Maryland 20664 ("property") comprises about 122 acres and contains five separate residences (the Main House, the Cottage House, the Tenant House, the Pool House, and the Gate House). Before leasing the property to Williford, Ross met with Harold Mertz ("Mertz") to discuss a listing agreement for the property. (ECF No. 40-1 at 56.) Later, Ross entered into three separate agreements ("Brokerage Agreements") with RE/MAX 100, which granted Defendants the right to offer for lease the Main House, the Cottage House, and the Pool House. Notably, none of the Brokerage Agreements granted Defendants the

right to offer for lease the entire property. The Brokerage Agreements were unrelated to the listing agreement that Ross purportedly entered into with Mertz.

In March 2014, Defendants received an application from individuals seeking to rent the Main House. Lindley, who is associated with RE/MAX 100, obtained credit reports for the prospective tenants and no agreement for the rental of the Main House was reached. In July 2014, Lindley received an application for an individual to rent the Pool House. Lindley transmitted the application to Ross, noting that it was incomplete and warning Ross of the risks associated with renting to a tenant without complete information. Ross subsequently entered into a lease agreement with this tenant. In July and August 2014, without the assistance of Defendants, Ross located tenants to occupy the Gate House, the Cottage House, and the Tenant House, and negotiated lease agreements with those tenants.

In August 2014, Ross negotiated the terms of a lease agreement with Williford. During the negotiations, Ross was assisted by Mertz, who assured Ross that Williford "was a very responsible person," that Mertz had known Williford for "quite a while," that Williford paid his rent on time, and that that Ross "could rely on [Williford]." (*See* ECF No. 40-1 at 50.) Based on Mertz's representations, as well as Ross's own intuition about Williford, Ross decided to lease the property to him. Williford submitted an Application for Tenancy to Lindley, wherein he indicated a monthly income in excess of $10,000 and assets including $7,500 in a bank account. At Ross's instruction, Lindley memorialized the terms of the lease agreement that Ross and Williford had discussed.

The essential terms of the Williford Residential Dwelling Lease ("Williford Lease" or "Lease") were that Williford would pay Ross monthly rent in the amount of $7,200.00, and in exchange, Williford would receive a lease for the entire property, including the "five homes, out

buildings, stable, & land" situated thereon, for a period of five years. (ECF No. 40-1 at 1.) Williford, Ross, and Ross's son signed the lease agreement. (*Id.* at 53; *see also* ECF No. 45 at 12.) Besides verifying Williford's employment history with Mertz, Defendants did not conduct a background investigation or credit check of Williford.

Williford ultimately violated the terms of the Lease by failing to pay rent and failing to maintain the property, which resulted in financial hardship for Ross. Ultimately, Ross's property, which had been in his family for at least two generations, was foreclosed upon.

Ross brought this case to recover for his losses. He alleges that Defendants breached a contract that they had entered into with him by failing to conduct a proper background investigation of Williford. He also alleges that Defendants withheld adverse information about Williford from him, and that this amounted to a constructive fraud. Finally, he alleges that RE/MAX 100 was negligent in failing to supervise Lindley and that both Defendants were negligent in failing to conduct a proper background investigation of Williford before Ross signed the lease agreement. In their counterclaim, Defendants allege that Ross agreed to pay a commission to Defendants. Because Ross has not paid the full balance due on the commission, Defendants allege that Ross is liable for breach of contract.[2]

### III. Analysis

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the

---

[2] In their Counterclaim, Defendants also seek indemnification under the terms of the Lease, but that claim is not at issue in the motions for summary judgment.

motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

"When faced with cross-motions for summary judgment, [courts] consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Bacon v. City of Richmond*, 475 F.3d 633, 636-37 (4th Cir. 2007). "The court must deny both motions if it finds that there is a genuine dispute of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Sky Angel U.S., LLC v. Discovery Commc'ns., LLC*, 95 F. Supp. 3d 860, 869 (D. Md. 2015) (internal citation and quotation marks omitted). The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest upon the mere allegations or denials of its pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### A. Breach of Contract

Count I of Ross's Amended Complaint is for breach of contract. However, it is difficult to discern what contract Ross believes was breached. There are possibly two contracts at issue: a contract that Ross entered into with Mertz ("Mertz contract"), and the Williford Lease itself. The

Mertz contract cannot serve as a basis for Defendants' liability because Defendants were not parties to the Mertz contract and could not be bound by any action taken by Mertz. In addition, Mertz submitted an affidavit, in which he states that he has never been affiliated or employed by RE/MAX 100, has never had the authority to act on behalf of RE/MAX 100, has never entered into any contract (or had the authority to enter into any contract) on behalf of RE/MAX 100 or Lindley, and has "never co-brokered any property or transaction with Ms. Lindley, or with anyone affiliated with RE/MAX 100." (ECF No. 40-1 at 73-74.) Ross has not submitted a copy of the purported Mertz contract or any other evidence, besides self-serving and non-specific statements, to substantiate its existence.

The other contract is the Williford Lease. In the Amended Complaint, Ross alleges that the "failure of the Defendants to perform any background checks, confirm rental history, check judgment index or obtain a credit report for Kendall Williford prior to recommending him for tenancy in the subject property amounts to a breach of the obligations under the contract." (ECF No. 34 at 5.) Notably, the Williford Lease does not specify that Defendants have any such obligations. Ross concedes that the Williford Lease itself is "silent as to the obligation upon the realtor to undertake any background or credit checks," but argues that the Williford Lease was modified by the subsequent conduct of Defendants. (*Id.* at 4-5.) Specifically, Ross came to expect that Lindley would perform background and credit checks for prospective tenants. Alternatively, Ross expected that he would be required to waive such checks in writing.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). The Court of Appeals of Maryland has stated that when interpreting contracts, "the clear and unambiguous language of an agreement

6

will not give way to what the parties thought the agreement meant or intended it to mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." *Bd. of Trustees of State Colleges v. Sherman*, 280 Md. 373, 380 (1977). A contracting party is not bound merely by the assumptions or beliefs of the other contracting party, but is instead bound by the contract itself. *Gill v. Computer Equip. Corp.*, 266 Md. 170, 179 (1972).

The terms of a contract may be modified by the parties, including by a subsequent oral agreement. *Berringer v. Steele*, 133 Md. App. 442, 504 (2000) (citing *Chesapeake Supply & Equip. Co. v. Manitowoc Eng'g Corp.*, 232 Md. 555, 566 (1963)). But a contract may not be modified unilaterally. Instead, a valid modification requires "a manifestation of mutual assent," *Cochran v. Norkunas*, 398 Md. 1, 14 (2007), and consideration.[3] *Expo Properties, LLC v. Experient, Inc.*, No. GLR-14-0688, 2016 WL 3997290, at *7 (D. Md. July 26, 2016). Manifestation of mutual assent includes the (1) intent to be bound, and (2) definiteness of terms. *Cochran*, 398 Md. at 14. Consideration is "a benefit to the promisor or a detriment to the promisee." *Harford Cty. v. Town of Bel Air*, 348 Md. 363, 382 (1998). It "necessitates that 'a performance or a return promise must be bargained for.'" *Chernick v. Chernick*, 327 Md. 470, 479 (1992) (quoting Restatement (Second) of Contracts § 71 (1981)). A performance is bargained for if it is sought by the promisor in exchange for his promise and is given by the

---

[3] Although they do not apply here, there are circumstances in which courts have enforced contractual modifications without new consideration, including when "(1) there is an honest dispute over the interpretation of the original contract and the modification represents an agreement or compromise between the parties to change the terms of the underlying contract and enter into a new contract; (2) modification is necessitated by substantial, unforeseen difficulties that were not, and could not have been, contemplated by the parties at the time they entered into the original contract; or (3) one party's performance pursuant to the modification has been accepted by the other party." *Willis v. Countrywide Home Loans Servicing, L.P.*, No. CCB-09-1455, 2010 WL 2857801, at *3 (D. Md. July 19, 2010)

7

promisee in exchange for that promise. Forbearance to exercise a right or pursue a claim, or an agreement to forbear, constitutes sufficient consideration to support a promise or agreement. *Id.* (internal quotation marks and citations omitted). There is "no consideration when a party performs or promises to perform a pre-existing legal obligation." *Expo Properties*, 2016 WL 3997290, at *8 (citing *Berger v. Burkoff*, 200 Md. 561, 567 (1952)).

The question of "whether subsequent conduct of the parties amounts to a modification . . . of their contract is generally a question of fact to be decided by the trier of fact." *University Nat'l Bank v. Wolfe*, 279 Md. 512, 523 (1977). Nonetheless, summary judgment is proper if no rational trier of fact could conclude that the terms of a contract were modified. *See Myers v. Kayhoe*, 391 Md. 188, 206 (2006).

Defendants have submitted uncontroverted evidence that Mertz did not have authority to bind them to any contract with Ross. Even assuming that Mertz did enter into a contract with Ross (no party has submitted this purported contract to the Court), the contract was not binding on Defendants because they were not parties to it and Mertz had no authority to act on their behalf.

Regarding Ross's argument that some other contract existed that was binding on the Defendants, no rational jury could find that there was manifestation of mutual assent or consideration such that an enforceable contract was created. The terms of the Williford Lease, to which Defendants were not a party but rather third-party beneficiaries, contain no requirement that Defendants perform any sort of background or credit check. Although Ross expected Defendants to perform background or credit checks on Williford, his expectations were based on an assumption, and not any contractual obligation of Defendants. Notably, as Defendants point out in their motion, the Williford Lease expressly states that Defendants "are not and were not at

8

any time authorized to make any representations regarding this Lease . . . other than those" contained in the Lease. (ECF No. 40-1 at 4.) The Lease further states that Defendants "do not assume any responsibility for the . . . performance of [the] Lease by any or all parties" thereto. (*Id.*) Ross signed the Williford Lease and acknowledged during his deposition that he had read the Lease before signing it. (*Id.* at 53.)

Ross attempts to conflate Defendants' obligations under the Williford Lease with their obligations under the Brokerage Agreements. But none of those agreements required Defendants to undertake any background or credit check of potential tenants. In fact, the Brokerage Agreements specifically stated that Defendants were "being retained solely as a real estate broker and not as a credit reporting agency . . . or other professional service provider," and that Defendants' "sole undertaking is to obtain a tenant" for the Main House (ECF No. 40-1 at 78), the Cottage House (*id.* at 98), and the Pool House (*id.* at 114). Further, no rational jury could find a manifestation of mutual assent or consideration sufficient for modification of the Brokerage Agreements, such that they applied to the entire property that is the subject of the Williford Lease and that Defendants had agreed to undertake obligations that were specifically exclaimed in the Brokerage Agreements. Even assuming that Lindley had previously undertaken obligations not required of her in the Brokerage Agreements, Ross has provided no evidence that Lindley intended to modify the terms of the Brokerage Agreements, that the terms of such modification were definite, that there was any consideration for the modification, or that the modification extended the terms of the Brokerage Agreements to the entire Property.

In summary, no rational jury could find that Defendants had any contractual obligation to evaluate or vet Williford as a tenant for Ross's rental property. Lacking any such obligation, Defendants have shown that they are entitled to judgment is a matter of law. Defendants' motion

is granted with respect to Ross's breach of contract claim. Ross's cross-motion is denied as to this claim.

### B. Constructive Fraud

Constructive fraud is a "breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Canaj, Inc. v. Baker and Division Phase III, LLC,* 391 Md. 374, 422 (2006) (internal quotation marks omitted). "Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 236 n.11 (1995) (quoting *Scheve v. McPherson*, 44 Md. App. 398, 406 (1979)).

Ross states that "it is clear that a duty was undertaken by [Defendants] to screen prospective tenants for Ross." (ECF No. 43-1 at 8.) Although the Court has ruled that Defendants did not have a contractual duty to vet prospective tenants for Ross, the Court will assume *arguendo* that Defendants had a fiduciary duty to communicate all material information about prospective tenants to Ross, at least to the extent that such information was in their possession. The information that Ross alleges was withheld from him is that Williford had limited liquid assets ($7,500 in a bank account) and that "if Williford did not get the State of Maryland grant he could not afford the property." (*Id.* at 8-9.) The evidence submitted by the parties, however, indicates that the Defendants disclosed all material information about Williford to Ross.

During her deposition, Lindley testified that before she prepared the Williford Lease, she had Williford complete an application for tenancy on a RE/MAX 100 form.[4] (ECF No. 41-2 at

---

[4] On the fifth page of Williford's application, Williford wrote that a background check had been waived by Ross. (ECF No. 40-1 at 194.) Mertz asserts in a signed affidavit that on August 21, 2014 Ross "stated that no credit report for Mr. Williford or background investigation

144.) Although Ross and Williford had negotiated the terms of the Lease among themselves (*see* ECF No. 40-1 at 53-54), Lindley wanted the application for her file and for Ross's file. (*Id.*) Lindley gave a copy of the application to Ross. (*Id.*; ECF No. 41-2 at 148.) Lindley also testified that Ross was aware that Williford was "actively pursuing a grant" that would supply him with additional means to pay the rent due under the Lease. (*Id.* 147-48.) Ross has submitted no evidence to place these facts in dispute.[5]

---

of Mr. Williford would be needed, or words that effect." (ECF No. 42-1 at 2.) Lindley also confirms that Ross waived any background check for Williford. (ECF No. 41-2 at 144.) Ross disputes this point, but at the same time admits that he does not know whether his son told Williford that a background and credit check was unnecessary. (ECF No. 40-1 at 52.) Williford states that Ross never requested a credit report or "any information regarding judgments, prior rental history, employment, personal finances or related matters." (*Id.* at 193.) He also states that Ross "indicated that there was no need for [his] credit report to be obtained, or for any background check of [him] to be undertaken." (ECF No. 42-1 at 5.) In any event, the issue of whether Ross waived a background check for Williford is immaterial to the issues before the Court because Ross has not established that the Defendants had any duty to conduct such a background check in the first place.

[5] Ross attached a document titled "Affidavit of William Bradford Ross, III" to his reply in support of his motion for summary judgment. (ECF No. 44-2.) This document, which is not dated and not signed, is not admissible evidence. *See, e.g. Bowman v. Baltimore City Bd. of Sch. Commissioners*, No. RDB-15-1282, 2017 WL 3457707, at *5 n.6 (D. Md. Aug. 11, 2017) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 n. 17. (1970) and *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)). Accordingly, the Court is not required to determine whether document is inconsistent with Ross's prior sworn statements or otherwise amounts to a disfavored "self-serving affidavit." *Jones v. Puffenbarger*, No. CCB-15-3137, 2017 WL 1020819, at *15 (D. Md. Mar. 15, 2017) (noting that a self-serving affidavit is "not sufficient to withstand summary judgment") (citing *National Enterprises, Inc. v. Barnes*, 201 F3d 331, 335 (4th Cir. 2000)). The Court notes that Ross testified during his deposition that Williford's "own financial statement," which Lindley was in possession of, "would lead to [the] conclusion" that Williford was not fit to be a tenant. (ECF No. 40-1 at 60.) But Ross did not testify that this information had not been provided to him in the form of Williford's application for tenancy; he only testified that he had "never seen" the document. Ross's testimony on this point is not in conflict with Lindley's testimony. It may be that Ross never saw the document because he never bothered to look at it. This is consistent with his testimony that he relied on Mertz's recommendation of Williford as a tenant because Ross "was in a very desperate situation," that his "world was upside down," that he "needed 7200 bucks a month" and "needed to get that money PDQ." (ECF No. 40-1 at 52.)

Based on the facts before the Court, no rational jury could conclude that Defendants breached some legal or equitable duty in a manner that amounts to constructive fraud. The only evidence before the Court is that Lindley produced all material information in her possession about Williford to Ross at the time that the Lease was signed. Because Ross was in possession of all material information regarding Williford, no rational jury could conclude that he was deceived. Defendants' motion is granted with respect to Ross's constructive fraud claim. Ross's cross-motion is also denied as to this claim.

### C. Negligence

In Maryland, the elements of a negligence claim are "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 290 (2006).

Ross alleges that the Defendants were negligent in different ways. Ross alleges that RE/MAX 100 was negligent because it did not "exercise reasonable and adequate supervision over the activities" of Lindley. (ECF No. 41-1 at 8.) In support of his argument, he cites to provisions contained in the Code of Maryland Regulations ("COMAR"). Ross alleges that because Lindley "had never been trained in the creation or execution of master leases with assignment of subleases," RE/MAX 100 was negligent in failing to review the Williford Lease, which Lindley had prepared. (*Id.* at 9.) Ross alleges that Lindley was negligent because she "possessed information which she chose not to provide to Ross," and "failed to undertake the most basic reviews of the qualifications of Williford," including a credit check, a background check, and a "confirmation of Williford's bank accounts or other assets." (*Id.*) Ross also alleges

12

that Lindley was negligent because she did not provide Williford's application for tenancy to Ross. (*Id.*)

COMAR 09.11.05.01 *et seq* concerns the obligation of a real estate broker to exercise reasonable and adequate supervision over the activities of the broker's associate brokers and salespersons. The regulations list a number of factors to be considered in determining the adequacy of supervision, including the availability of training sessions, the availability of supervisory personally to review and discuss contract and brokerage agreement provisions, and the existence of written policies containing clear guidance on matters such as the proper handling of funds, compliance with fair housing laws, and the "[r]eview of contracts, leases, and brokerage agreements upon execution by all parties to the contract, lease, or brokerage agreement."

Ross argues that RE/MAX 100 failed to exercise the reasonable and adequate supervision over Lindley that is required by COMAR. He points to Lindley's deposition testimony, where she indicated that RE/MAX 100 did not have "any policies and procedures in place as it relates to . . . having [Lindley's] work reviewed by any supervisory personnel," at least with regard to the review of leases before they were executed. (ECF 41-2 at 148.) Even assuming that RE/MAX 100's violation of the Maryland regulations is relevant to the issue of whether RE/MAX 100 was negligent, *contra Herbert v. Saffell*, 877 F. 2d 267, 275-76 (4th Cir. 1989), Lindley's testimony is not evidence that RE/MAX 100 violated any regulations. The regulations note that the existence of procedures and policies regarding the supervisory review of leases "upon execution by all parties to the contract" is a factor to consider in determining whether supervision was

reasonable and adequate.[6] But Lindley did not testify about the review of leases *after* they had been executed. She stated that she was not aware of any policy allowing for the review of leases *before* they had been executed. Maryland regulations do not call for consideration of whether brokers review leases prepared by associates *before* they have been executed by all parties to the contract.

Ross also argues that "Lindley possessed information which she chose not to provide to Ross." (ECF No. 41 at 9.) But, as discussed above, Ross has submitted no evidence to support this contention. The only evidence before the Court is that Lindley transmitted all material information regarding Williford's prospective tenancy to Ross. In addition, to the extent that Ross contends that Lindley's failure to perform a credit check, a background check, or to "request[] . . . confirmation of Williford's bank accounts or other assets" amounts to negligence, his argument lacks merit. As Defendants correctly note, "[n]either the Maryland Real Estate Brokers Act nor the concomitant provisions of [COMAR] require that Maryland real estate licensees undertake any such investigation of prospective tenants." (ECF No. 40 at 23.) This point was underscored by Ross's expert witness, Cindy Moses, who testified during her deposition that "there's no legal obligation" for Maryland real estate licensees "to conduct or order court record searches of prospective tenants," or to conduct "other sorts of searches, rental history, criminal background, that sort of thing." (ECF No. 40-1 at 206.)

Ross has not submitted any evidence to establish that Defendants breached any tort duty they owed to him. Because of this, no rational jury could conclude that Defendants were

---

[6] In another place, COMAR 09.11.05.03 states that evidence of review by the broker of leases "executed by all parties" is a factor to consider in determining whether supervision is reasonable and adequate.

negligent. Defendants' motion is granted with respect to Ross's negligence claim. Ross's cross-motion is also denied as to this claim.

D.  **Defendants' Counterclaim – Breach of Contract**

Defendant RE/MAX 100 alleges that "Ross entered into a contractual agreement pursuant to which he agreed to pay the sum of $7,192.00 to RE/MAX 100 as a commission or brokerage fee in connection with Mr. Williford's lease of the Property." (ECF No. 35 at 9-10.) Defendant's counterclaim is based on an addendum to the Williford Lease. (ECF No. 40-1 at 19.) This addendum states, in pertinent part, that "October 2014 Rent, $7,200 will be payable to ReMax 100 as payment in full of Commissions Due." (*Id.*) The addendum further specifies, in handwritten script, that "ReMax will be paid $4,300 up front and $241 for the next 12 months – thru Aug 2015 – May be paid sooner." (*Id.*) The addendum is signed by Lindley, Williford, Ross, and Ross's son. (*Id.*; *see also* ECF No. 40-1 at 53.) The Court notes that during his deposition, Ross testified that the commission due under the Williford Lease was for "one month's rent." (ECF No. 40-1 at 54.)

In support of its counterclaim for breach of contract, RE/MAX 100 has submitted an affidavit sworn to and signed by Lindley. (ECF No. 40-1 at 32-33.) In the affidavit, Lindley states that Ross "only paid $4,200.00 of the $7,192.00 commission due and owed to Realty Group LLC t/a RE/MAX 100."[7] (*Id.* at 33.)

In response to RE/MAX 100's motion for summary judgment on its counterclaim for breach of contract, Ross states that no response "need even be addressed as it is glaringly

---

[7] There is a discrepancy between the amount of the total commission stated to be due under the addendum to the Williford Lease and the total amount due in Lindley's affidavit. Defendants explain that the discrepancy is the result of a mathematical error. Defendants voluntarily limit their counterclaim for breach of contract to $2,992, which is calculated based on the lesser amount listed in Lindley's affidavit. (ECF No. 40 at 26.)

apparent . . . that the Defendants did not perform their contract, ignored its obligations to Ross, withheld information from Ross and participated with Williford in a scheme which ultimately cost Ross his family farm." (ECF No. 43-1 at 15.)

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor*, 365 Md. at 175. Through Lindley's affidavit, RE/MAX 100 has established that Ross had a contractual obligation to pay a commission in the total amount of $7,192.00 by no later than August 2015. Ross has not submitted any evidence that places this evidence in dispute, or that otherwise excuses his performance under the contract. Because the uncontroverted evidence establishes that Defendant RE/MAX 100 is entitled to judgment as a matter of law on its counterclaim for breach of contract, Defendants' motion is granted with respect this counterclaim.

**IV. Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 40) is granted and Ross's Motion for Summary Judgment (ECF No. 41) is denied. The parties are directed to submit a joint status report by **March 6, 2018**. The status report should address whether Defendants intend to proceed with Count II of their Counterclaim ("Contractual Attorneys' Fees/Indemnification"), which was not addressed in either of the motions for summary judgment. A separate order follows.

February 20, 2018  /s/
Date Timothy J. Sullivan
United States Magistrate Judge